# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **TOMMY E. HORNE,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 1:13cv00049 |
| | ) | **MEMORANDUM  OPINION** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | By:  Pamela Meade Sargent |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Tommy E. Horne, ("Horne"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

-1-

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Horne protectively filed his applications for SSI and DIB on July 7, 2010, alleging disability as of June 11, 2010, due to severe back pain radiating down into the right hip and leg, right leg giving way, severe left knee pain, bilateral hand numbness, lack of grip in the hands, severe pain in both arms and elbows, left shoulder pain, neck pain, high blood pressure, depression, poor concentration, insomnia and a "spot" on his brain. (Record ("R."), at 21, 155, 205, 209, 224-25.) The claims were denied initially and upon reconsideration. (R. at 96-98, 105, 107-09, 111-13.) Horne then requested a hearing before an administrative law judge, ("ALJ"). (R. at 114.) This hearing was held on February 1, 2012, at which Horne was represented by counsel. (R. at 30-57.)

By decision dated February 13, 2012, the ALJ denied Horne's claims. (R. at 21-29.) The ALJ found that Horne met the disability insured status requirements of the Act for DIB purposes through March 31, 2014. (R. at 23.) The ALJ found that Horne had not engaged in substantial gainful activity since June 11, 2010, the alleged onset date. (R. at 23.) The ALJ found that the medical evidence established that Horne had severe impairments, namely degenerative joint disease of the knees; spondylosis of the lumbar spine; atherosclerotic stenosis of both carotid arteries; and carpal tunnel syndrome, status-post right carpal tunnel release, but the ALJ found that Horne did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1. (R. at 23-24.) The ALJ found that Horne had the residual functional capacity to perform a range of sedentary work.[1] (R. at 24.) Specifically, the ALJ found that Horne could lift and carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently, stand and/or walk up to two hours in an eight-hour workday, sit up to six hours in an eight-hour workday and push/pull consistent with the above lifting/carrying limitations. (R. at 24.) The ALJ also found that Horne must be allowed to alternate between sitting and standing at approximately 30-minute intervals throughout the workday and that he could never climb ladders, ropes or scaffolds, occasionally climb ramps and/or stairs, twist, stoop, kneel and crawl, never crouch or squat and frequently, but not constantly, handle and finger objects. (R. at 24-25.) The ALJ also found that Horne must avoid even moderate exposure to moving machinery and unprotected heights and could perform only work that did not require multiplication or division. (R. at 25.) The ALJ found that Horne was unable to perform any of his past relevant work. (R. at 28.) The ALJ found that Horne had a limited education.[2] (R. at 28.) Based on Horne's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Horne could perform, including jobs as production worker, a laborer and a hand bander. (R. at 28-29.) Thus, the ALJ concluded that Horne was not under a disability as defined by the Act and was not

[1] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing often is necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2013).

[2] An individual with a limited education has ability in reasoning, arithmetic and language skills, but not enough to perform most of the more complex job duties needed in semi-skilled or skilled jobs. The Social Security Administration generally considers a seventh-grade through 11th-grade level of formal education to be a limited education. *See* 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3) (2013).

Case 1:13-cv-00049-PMS   Document 17   Filed 11/18/14   Page 3 of 33   Pageid#: 669

eligible for DIB or SSI benefits. (R. at 29.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2013).

After the ALJ issued his decision, Horne pursued his administrative appeals, but the Appeals Council denied his request for review. (R. at 1-5, 16-17.) Horne then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2013). This case is before this court on Horne's motion for summary judgment filed January 20, 2014, and the Commissioner's motion for summary judgment filed February 24, 2014.

## II. Facts[3]

Horne was born in 1967, (R. at 28), which, at the time of the ALJ's decision, classified him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Horne has a seventh-grade education and has received no vocational training. (R. at 35.) He testified that he could read and write "[a] little bit," and he stated that he had difficulty with math, noting that he could perform only addition. (R. at 35, 47.) Horne has past relevant work as a brick mason. (R. at 210.) He testified that he returned to work for his brick mason employer after his alleged onset date of June 11, 2010, until August 2011, but worked "on [his] own pace" and sometimes could not finish a 40-hour week due to back and knee pain. (R. at 35-36, 40, 48.) He testified that he had undergone surgery on his left knee and was receiving

---

[3] Horne must show that he was disabled during the period from June 11, 2010, the alleged onset date, through February 13, 2012, the date of the ALJ's decision. To the extent that medical evidence pertaining to a period outside of this time frame is included herein, it is for clarity of the record.

Case 1:13-cv-00049-PMS   Document 17   Filed 11/18/14   Page 4 of 33   Pageid#: 670

injections from Dr. Mullins and had undergone physical therapy for his back.[4] (R. at 43-45.) Horne also stated that he took prescription pain medication for his back. (R. at 43.) Horne also testified that he experienced numbness and tingling in his hands, and he could not bend down or climb due to his knees. (R. at 41.) He stated that he also had undergone carpal tunnel surgery on his right hand, which improved the numbness, but not his grip. (R. at 44.) Horne also testified that he had problems with his left shoulder, noting that he could not lift it over his head without pain. (R. at 49.) He stated that he also had experienced "a few" mini strokes in the past. (R. at 44.) Horne estimated that he could lift approximately 20 pounds, sit for up to 20 minutes, stand for up to 20 minutes and walk for up to 40 feet. (R. at 42-43.) Horne testified that he could bend only "a little bit" due to problems with his back. (R. at 43.)

AnnMarie Cash, a vocational expert, also was present and testified at Horne's hearing. (R. at 49-56.) The ALJ asked Cash at the outset whether she understood that if she gave an opinion that conflicted with the information in the Dictionary of Occupational Titles, ("DOT"), that she must advise the court of the conflict and the basis for her opinion. (R. at 50.) Cash affirmed her understanding. (R. at 50.) Cash classified Horne's past work as a concrete worker, as performed, as heavy[5] and semi-skilled and as a dump truck driver as medium[6] and unskilled.

---

[4] There are no treatment notes in the record to substantiate Horne's claim that he underwent physical therapy for his back.

[5] Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2013).

[6] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2013).

-5-

(R. at 50-51.) She was asked to assume a hypothetical individual of Horne's age, education and work experience who could perform the lifting restrictions of medium work, but who could stand and/or walk for four hours in an eight-hour workday, who could push/pull consistent with the lifting restrictions, who could occasionally twist, climb ramps or stairs, stoop, crouch and squat, but never climb ladders, ropes or scaffolds, who should avoid moderate exposure to moving machinery and unprotected heights and who would need the option to alternate positions at about one-hour intervals. (R. at 51.) Cash testified that such an individual could not perform any of Horne's past work, but could perform other jobs existing in significant numbers, including jobs as a production worker, a laborer and a hand bander, all at the sedentary level of exertion. (R. at 51-52.)

Cash next testified that the same hypothetical individual, but who was limited to lifting up to 20 pounds occasionally and up to 10 pounds frequently, who could stand and/or walk for about two hours in an eight-hour workday and sit for up to six hours in an eight-hour workday, who would need the option to alternate positions at about one-hour intervals, who could push/pull consistent with the lifting restrictions, who could occasionally twist, climb ramps or stairs, stoop, kneel and crawl, never climb ladders, ropes or scaffolds, crouch or squat, frequently, but not constantly, handle and finger objects, who should avoid even moderate exposure to moving machinery and unprotected heights and who would need a job that did not require multiplication or division, could perform the jobs previously identified. (R. at 52-53.) However, Cash testified that, if the individual were absent from work on an unexcused basis more than two days per month, he could perform no work. (R. at 53.) Cash also testified that, if the last hypothetical were changed to indicate that the individual needed to alternate positions every 30 minutes, he still could perform the sedentary jobs previously mentioned. (R. at 53.)

However, Cash testified that an individual who had to sit and stand every 10 minutes throughout the entire day, would be considered off-task, and there would be no jobs he could perform. (R. at 53-54.) Cash testified that a hypothetical individual of Horne's age, education and work experience with the restrictions set forth in Dr. Mullins's November 27, 2011, physical assessment, could not perform any jobs, nor could the same hypothetical individual, but with the restrictions set forth in Dr. Litton's December 29, 2011, physical assessment. (R. at 55.)

At the conclusion of the vocational expert's testimony, the ALJ asked Cash whether her testimony was consistent with the DOT, with the exception of the sit/stand option, which is not addressed in the DOT. (R. at 56.) Cash stated "Yes, sir." (R. at 56.) The ALJ then inquired, "And how did you arrive at your opinions with regard to the sit-stand option?" to which she replied, "Because I'm a vocational expert, and I am familiar with those jobs, and I do job placement, so I know that's available." (R. at 56.)

In rendering his decision, the ALJ reviewed records from Horizon Family Medicine; Russell County Medical Center; Abingdon Radiology Services; Stone Mountain Health Services; Johnston Memorial Hospital; Indian Path Medical Center; Mountain States Health Alliance; Holston Medical Group; Associated Neurologists of Kingsport; Solstas Lab Partners; Dr. Darlene Litton, M.D.; Dr. Danny A. Mullins, M.D.; Dr. Anthony Holt, D.O.; Bristol Regional Medical Center; Medical Associates at Exit 7; Sapling Grove Surgery Center; Appalachian Orthopaedic Associates; Dr. Robert H. McQueen, M.D.; Norton Community Hospital; Dr. Brian Strain, M.D., a state agency physician; Joseph Leizer, Ph.D., a state agency psychologist; and Dr. Michael Hartman, M.D., a state agency

-7-

physician. Horne's counsel submitted additional medical records from Dr. Mullins to the Appeals Council.[7]

On May 18, 2010, Horne was seen at Stone Mountain Health Services, ("Stone Mountain"), with complaints of constant, severe, nonradiating neck and lumbar pain for the previous one to two weeks, as well as chronic left knee pain. (R. at 374.) Horne's blood pressure was 200/118, and it was noted that he had not been compliant with blood pressure medications. (R. at 374.) Cervical and lumbosacral range of motion was decreased. (R. at 375.) Ibuprofen, Flexeril and a Medrol dosepak were added to Horne's medication regimen. (R. at 376.) Lumbar and left knee x-rays were ordered. (R. at 376.) On May 25, 2010, when Horne returned to Stone Mountain for a follow-up on his blood pressure, he reported taking his blood pressure medication every morning, but forgetting to take in the evenings. (R. at 328-30, 372-73.) Horne stated that his pain had improved mildly, noting that he returned to his masonry job, but could work for only 30 minutes. (R. at 328.) He exhibited decreased cervical and lumbosacral range of motion. (R. at 329.) Horne was diagnosed with uncontrolled hypertension and lumbar, left knee and neck pain. (R. at 330.) Horne underwent a series of x-rays on May 25, 2010. (R. at 338.) An x-ray of Horne's cervical spine was normal, an x-ray of the left knee showed no bony, joint or soft tissue abnormality, and an x-ray of the lumbar spine showed only mild spondylosis at multiple levels. (R. at 338.) On August 10, 2010, Horne reported continued constant neck, lumbar and left knee pain with only mild relief with medications. (R. at 325, 368-70.) He also reported intermittent upper extremity and right leg numbness, but no bowel or bladder symptoms and no

_____

[7] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-5), this court also must take it into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

muscle weakness. (R. at 325, 368.) Horne's blood pressure was 180/112. (R. at 325, 368.) He exhibited decreased lumbosacral flexion. (R. at 326, 369.) Horne's medications were adjusted, and MRIs of the neck, lumbar spine and left knee were ordered. (R. at 327, 370.)

In a Physical Residual Functional Capacity Assessment dated August 23, 2010, Dr. Brian Strain, M.D., a state agency physician, found that Horne could lift and carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently. (R. at 61-62.) Dr. Strain opined that Horne could stand and/or walk for about six hours in an eight-hour workday and sit for about six hours in an eight-hour workday. (R. at 61.) Dr. Strain also opined that Horne could frequently climb ramps and stairs, balance, stoop and crouch, but occasionally climb ladders, ropes or scaffolds, kneel and crawl. (R. at 61-62.) He further opined that Horne should avoid concentrated exposure to hazards, such as machinery and heights. (R. at 62.)

Horne presented to the emergency department at Johnston Memorial Hospital on October 21, 2010, with complaints of vomiting and dizziness for the previous four days. (R. at 353-64.) He was administered Antivert and Phenergan. (R. at 354.) His blood pressure was 160/112. (R. at 356, 360.) A CT scan of Horne's head showed low density areas in the periventricular white matter, representing probable chronic small vessel ischemic change, advanced for Horne's age. (R. at 349.) A demyelinating process such as multiple sclerosis was not excluded, and an MRI was recommended for further evaluation. (R. at 349.) Horne was diagnosed with benign positional vertigo and discharged in good condition with prescriptions for Antivert and Phenergan. (R. at 357, 361-62.)

When Horne returned to Stone Mountain on November 3, 2010, he reported his recent emergency department visit. (R. at 365-67.) Horne was diagnosed with vertigo/abnormal CT, hypertension and chronic pain, among other things, and he was continued on Meclizine. (R. at 367.) An MRI of the brain was ordered. (R. at 367.) This MRI of Horne's brain, dated November 22, 2010, showed nonspecific T2 hyperintensities in the deep and juxtacortical white matter with tiny bilateral lacunar infarcts,[8] the distribution of which was not typical of a demyelinating process, but more likely due to chronic microvascular ischemic change. (R. at 351-52.) The MRI also showed multiple old lacunar infarcts in the left inferior cerebellar hemisphere, as well as chronic mastoiditis with T2 hyperintensities in the mastoid processes. (R. at 352.)

On January 19, 2011, Horne saw Dr. Anthony E. Holt, D.O., a neurologist, for a stroke consultation. (R. at 422-24.) Horne reported that his dizziness had improved significantly, and he denied any focal neurological symptoms, noting no incoordination of either upper or lower extremity. (R. at 423.) Dr. Holt noted Horne's past history of uncontrolled hypertension. (R. at 423.) Horne admitted noncompliance with his blood pressure medications for a period of time, but stated he was currently compliant. (R. at 423.) His blood pressure reading was 130/80, and his heart was of regular rate and rhythm. (R. at 423-24.) Sensation was intact throughout, and strength was 5/5 throughout all extremities. (R. at 424.) Muscle tone was normal in all extremities and the neck. (R. at 424.) Horne had 2+ reflexes

---

[8] Lacunar infarct is a type of ischemic stroke that occurs when blood flow to one of the small arterial vessels deep in the brain becomes blocked. The most common cause of lacunar stroke is chronic hypertension. *See* www.healthline.com/health-slideshow/lacunar-stroke-symptoms (last visited Nov. 17, 2014).

in the biceps, brachioradialis, triceps, patellar and Achilles, and Babinski's sign[9] was not present. (R. at 424.) Finger to nose and heel to shin testing was intact, and rapid hand movements were normal. (R. at 424.) Gait was intact, Horne could walk on his heels and toes and tandem walk, and Romberg's sign[10] was negative. (R. at 424.) After reviewing the October 21, 2010, CT scan and the November 22, 2010, MRI, Dr. Holt diagnosed lacunar infarcts and dizziness. (R. at 424.) He started Horne on aspirin and recommended a statin to his primary care physician. (R. at 422.)

On February 2, 2011, Dr. Holt performed a transcranial pulsed Doppler examination of the carotid arteries, finding that the arteries that were insonated were essentially normal. (R. at 425.) There was inability to insonate all arteries through the right temporal window, which was, most likely, a technical error. (R. at 425.) However, Dr. Holt stated that arterial disease could not be ruled out in these arteries. (R. at 425.) Dr. Holt found evidence of atherosclerotic stenosis in both internal carotid arteries, but less than 50 percent bilaterally. (R. at 426.) On the same day, an echocardiogram was performed, showing a normal left ventricular ejection fraction, a mildly increased ventricular wall thickness and a mildly increased interventricular septum, ("IVS"), wall thickness, mild mitral valve regurgitation, mild thickening/calcification of the anterior and posterior mitral leaflets and no evidence of patent foramen ovale, ("PFO"). (R. at 417-18.)

---

[9] Babinski's sign refers to the loss or lessening of the Achilles tendon reflex in sciatica. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1520 (27th ed. 1988).

[10] Romberg's sign is a swaying of the body or falling when standing with the feet close together and the eyes closed. *See* Dorland's at 1525.

Horne was seen by Dr. Darlene Litton, M.D., at Medical Associates @ Exit 7,[11] ("Exit 7"), on February 15, 2011. (R. at 464.) He reported that his blood pressure was controlled at that time, as he had become compliant with his medications. (R. at 431, 464.) Horne also complained of left knee pain, and he exhibited pain with flexion and extension of the left knee. (R. at 431, 464.) He was diagnosed with cerebrovascular accident, ("CVA"), arthritis and high blood pressure. (R. at 431, 464.) An x-ray of the left knee was ordered, and Horne's medications were refilled, including metroprolol and Ultram. (R. at 431, 464.) When Horne returned to Exit 7 on March 18, 2011, he complained of worsened left knee pain, but improved blood pressure, which was 132/82. (R. at 463.) Horne's left knee was tender, and he had pain with flexion and extension. (R. at 463.) He was diagnosed with high blood pressure and knee pain, and an MRI of the left knee was scheduled. (R. at 463.)

On February 16, 2011, Horne underwent a magnetic resonance angiography, ("MRA"), of the brain and circle of Willis[12] without contrast. (R. at 427-28.) There was no evidence of an intracranial aneurysm, and normal circle of Willis anatomical variations were noted, but there were ischemic changes in the inferior left cerebellar hemisphere in the left pica distribution, and the white matter pathology, which was quite severe for Horne's age, suggested clinical correlation for hypertension, diabetes, vasculitis and possible vascular headaches. (R. at 428.) Also on February 16, 2011, left knee x-rays were normal. (R. at 448-49.)

---

[11] Some portions of these handwritten medical notes are illegible.

[12] Circle of Willis is an anastomotic system of arteries that sits at the base of the brain and encircles the pituitary gland. It provides important communication between the blood supply of the forebrain and the hindbrain. *See* www.emedicine.medscape.com/article/1877617_overview (last visited Nov. 17, 2014).

In a Physical Residual Functional Capacity Assessment completed on February 25, 2011, Dr. Michael Hartman, M.D., a state agency physician, found that Horne could lift and carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently. (R. at 80-81.) He found that Horne could stand and/or walk for about six hours in an eight-hour workday and sit for about six hours in an eight-hour workday. (R. at 80.) Dr. Hartman opined that Horne could frequently climb ramps and stairs, balance, stoop and crouch, but occasionally climb ladders, ropes or scaffolds, kneel and crawl. (R. at 80.) He found that Horne should avoid concentrated exposure to hazards, such as machinery and heights. (R. at 81.)

When Horne returned to Dr. Litton on March 18, 2011, he reported that his left knee pain was worse, but his blood pressure was better, which was 132/82. (R. at 432.) He had a tender left knee and pain with flexion and extension. (R. at 432.) Horne also had tender lateral lumbar muscles. (R. at 432.) Dr. Litton diagnosed low back pain and knee pain, and she ordered an MRI of the left knee. (R. at 432.)

On March 21, 2011, Horne returned to Dr. Holt, who noted that Horne had multiple lacunar infarcts, most likely due to uncontrolled hypertension as a result of medication noncompliance. (R. at 433-37.) Dr. Holt noted that Horne was taking aspirin and statin therapy and did not need any further workup for stroke at that time. (R. at 433.) Horne complained of right hand numbness, especially at night, but he denied muscle aches or joint pain. (R. at 434-35.) He denied tremor, weakness/paralysis, seizures, ataxia, dysarthria or memory loss. (R. at 435.) Horne's blood pressure was 142/90. (R. at 435.) Sensation was intact throughout, and motor strength was 5/5 in all extremities. (R. at 435-36.) Muscle tone was normal in all extremities and the neck. (R. at 436.) Reflexes were 2+ in the upper and lower extremities, and Babinski's sign was not present. (R. at 436.) Finger to

-13-

nose and heel to shin movements were intact, and rapid hand movements were normal. (R. at 436.) Gait was intact, Horne could walk on his heels and toes and tandem walk, and Romberg's sign was negative. (R. at 436.)

Dr. Holt opined that Horne's complaints of right hand numbness were due to carpal tunnel syndrome. (R. at 433.) He diagnosed strokes, dizziness and carpal tunnel syndrome, he continued Horne on aspirin and statin therapy, and he scheduled a nerve conduction study and electromyogram, ("EMG"), of the right upper extremity. (R. at 433.) Horne underwent this testing on March 23, 2011, the results of which showed moderate median neuropathy of the right wrist. (R. at 443, 445.) An MRI of the left knee, dated April 4, 2011, showed no meniscal tear, but minor chondral changes, effusion and mild soft tissue edema. (R. at 446-47, 450-51.)

Horne presented to the emergency department at Russell County Medical Center on April 10, 2011, with complaints of moderate left leg pain and an inability to weight bear. (R. at 456-60.) He denied any recent trauma. (R. at 456.) Physical examination showed resisted or limited active flexion and extension of the left knee, as well as a moderate amount of soft tissue swelling and diffuse, moderate tenderness over the entire joint without localization. (R. at 456.) Homan's sign[13] was positive, and there was 1+ edema in the left lower leg. (R. at 456, 459.) A noninvasive Doppler blood flow ultrasound was normal with no evidence of thromboembolic disease. (R. at 457.) Horne was given Toradol and Norflex. (R. at 459.) He was diagnosed with acute bursitis and acute muscular

---

[13] Homan's sign refers to pain on passive dorsiflexion of the foot indicative of thrombosis of deep calf veins. *See* Dorland's at 1523.

spasm. (R. at 457.) He was discharged home in satisfactory condition. (R. at 457, 459.)

Horne returned to Exit 7 on April 15, 2011, with a swollen left knee and calf. (R. at 462.) On April 23, 2011, he presented to the emergency department at Russell County Medical Center with complaints of progressively worsened leg pain for a day after "weedeating." (R. at 452-53.) Physical examination showed moderate pain with range of motion of the left hip, decreased range of motion of the left knee secondary to pain and a small amount of soft tissue swelling. (R. at 453.) Horne was diagnosed with acute tenosynovitis and a history of torn ligaments of the left knee. (R. at 453.) His blood pressure reading at discharge was 140/80, and his pain was improved. (R. at 455.) He received prescriptions for Naprosyn and Tylenol #3. (R. at 453.)

Horne saw Dr. Danny A. Mullins, M.D., an orthopaedist, on April 20, 2011, with complaints of left knee pain, worsening over the previous couple of months. (R. at 526-28.) He reported stiffness and worsening pain with activity and relief with rest. (R. at 526.) He denied any treatments, including injections, bracing or physical therapy. (R. at 526.) Horne stated that he began taking a steroid dosepak a couple of days previously that did seem to be helping. (R. at 526.) Physical examination of the left knee showed tenderness of the medial joint line to palpation, but full range of motion without pain. (R. at 526.) Horne had good strength of the knee extensors and toe extensors, and sensation to light touch was intact. (R. at 526.) He had 2+ pulse in the foot, no instability, negative patella apprehension and grind testing, but positive McMurray's testing.[14] (R. at 526.)

---

[14] McMurray's testing is used to determine the presence of a meniscal tear within the knee. *See* www.physio-pedia.com/McMurrays_Test (last visited Nov. 17, 2014).

There was no evidence of antalgic gait. (R. at 526.) Physical examination of the right knee showed excellent range of motion without tenderness and good strength of the knee extensors and toe extensors. (R. at 526.) Neurovascular exam was intact and equal bilaterally, and there was no instability. (R. at 526.) There was no swelling, varicosities, edema or atrophy, and Horne had good coordination. (R. at 527.) Dr. Mullins reviewed x-rays of the left knee, noting very mild degenerative changes with no fractures or lytic lesions or other malalignments. (R. at 527.) He also noted that an MRI of the left knee revealed medial meniscal tearing of the middle aspect, as well as of the posterior horn, and mild degeneration. (R. at 527.) Dr. Mullins diagnosed left knee pain with mild arthritis and medial meniscus tear. (R. at 527.) He prescribed a steroid dosepak, and he discussed the possibility of surgical intervention if medications were not helpful. (R. at 527.)

At an April 28, 2011, follow-up appointment at Exit 7, Horne complained of pain and swelling in the knee and ankle. (R. at 461.) He was diagnosed with knee and ankle pain and hypertension. (R. at 461.) On the same day, Horne also saw Dr. Mullins for a follow-up of his left knee pain. (R. at 528-29.) He reported that the steroids helped only for a couple of days, noting that he had received an intramuscular steroid injection at the emergency department, which helped some. (R. at 528.) Horne requested another steroid injection. (R. at 528.) Dr. Mullins agreed, further noting that if his symptoms were not significantly abated, he would refer him to a surgeon regarding a knee arthroscopy. (R. at 528.)

When Horne saw Dr. Mullins on May 12, 2011, he reported continued severe knee pain with mechanical-type symptoms, as well as swelling, for some months' duration, which had been unresponsive to conservative measures. (R. at 523-25.) Horne also reported that the injection helped for only three days. (R. at

-16-

523.) Dr. Mullins noted that an MRI showed no obvious meniscal pathology, but some chondral changes. (R. at 524.) Horne stated that his knee felt like it would give way or catch almost daily. (R. at 524.) Physical examination revealed an obvious antalgic gait, a large effusion and diffuse tenderness with palpation along the medial and lateral joint line, but otherwise full range of motion. (R. at 523-24.) Horne stated his preference to proceed with arthroscopic surgical intervention. (R. at 524.)

On May 19, 2011, Dr. Mullins performed a left knee diagnostic arthroscopy with partial medial and lateral meniscectomy with extensive chondroplasty of the patellofemoral articular surface and medial femoral condyle with moderately extensive synovectomy. (R. at 467-69, 475-82.) Horne was discharged home the same day in stable condition. (R. at 479-82.) He was advised to use crutches and to weightbear as tolerated. (R. at 480.) On June 1, 2011, Horne's wounds were well healed, and his sutures were removed. (R. at 587.) He still had mild effusion. (R. at 587.) Dr. Mullins referred Horne for a course of physical therapy for range of motion, strengthening and therapeutic modalities, and he gave him a limited refill on Lortab. (R. at 587.) He kept Horne out of work at that time, given his job as a mason. (R. at 587.)

When Horne saw Dr. Litton on June 27, 2011, he reported that he was experiencing pain in both knees. (R. at 495-96.) Horne reported that he had pain with bending both knees and that he had pain in the right knee to the calf. (R. at 495.) He stated that his left knee was "some better" since surgery, but it still gave out and was painful to bend, especially climbing stairs or scaffolding. (R. at 495.) His blood pressure reading was 149/103, but when taken with a different cuff, was 148/88. (R. at 495.) Horne had a limping gait. (R. at 495.) He had a restricted range

of motion in both knees, without swelling or edema, and there was no tenderness to palpation. (R. at 496.) Deep tendon reflexes were normal, and coordination, strength, tone and sensation were normal with no instability, subluxation or laxity and no known fractures or deformities. (R. at 496.) Some crepitus was present in the right knee, as was pain with flexion and extension. (R. at 496.) He also exhibited pain with flexion and extension of the left knee. (R. at 496.) Dr. Litton diagnosed Horne with high blood pressure, arthritis, knee pain and ankle pain. (R. at 496.) She continued him on medications. (R. at 496.)

On June 29, 2011, Horne saw Dr. Mullins for a surgical follow-up. (R. at 523.) He had not attended physical therapy as directed, and he reported already having returned to work. (R. at 523.) He complained of some puffiness and swelling with increased activity, for which Dr. Mullins recommended icing. (R. at 523.) Horne declined any injections at that point, and Dr. Mullins released him to perform activities as tolerated. (R. at 523.) On August 24, 2011, Horne returned to Dr. Mullins reporting a continued "fair amount" of pain and swelling. (R. at 522.) He further reported continuing to work as a bricklayer, but having difficulty doing so due to basic "wear and tear" type changes. (R. at 522.) Horne had a moderate sized effusion, and Dr. Mullins administered a Betamethasone injection. (R. at 522.) He also gave Horne prescriptions for Lortab, ibuprofen and Voltaren gel. (R. at 522.)

Horne returned to Dr. Holt on September 21, 2011, for a follow-up regarding stroke and carpal tunnel syndrome, as well as carotid artery disease. (R. at 486-90.) He denied any new focal neurological symptoms since his prior appointment, but did report one episode of dizziness and chest pain one month previously. (R. at 487.) Horne reported that he was working at that time. (R. at 487.) He stated that

-18-

he was recovering well from the left knee arthroscopy, but he complained of continued pain and numbness in his right hand, despite using a wrist brace for at least the prior month. (R. at 487.) Horne requested a referral for possible carpal tunnel surgery. (R. at 487.) He denied tremor, weakness/paralysis, seizures, ataxia, dysarthria and memory loss. (R. at 488.) His blood pressure reading was 140/72. (R. at 488.) Sensation was intact throughout, and motor strength was 5/5 throughout all extremities. (R. at 489.) Muscle tone was normal in all extremities and the neck, and reflexes were 2+ in the upper and lower extremities. (R. at 489.) Babinski's sign was not present. (R. at 489.) Finger to nose and heel to shin coordination was intact, and rapid hand movements were normal. (R. at 489.) His gait was intact, and he could walk on his heels and toes, as well as tandem walk. (R. at 489.) Romberg was negative. (R. at 489.) Dr. Holt diagnosed strokes, dizziness, carpal tunnel syndrome on the right and carotid artery disease, he continued Horne on aspirin and statin therapy, scheduled a carotid duplex for February 2012 and referred Horne to Dr. Mullins for possible carpal tunnel surgery. (R. at 486.) He advised Horne to cease all tobacco use. (R. at 486.)

When Horne saw Dr. Litton on September 27, 2011, he reported continued pain and swelling in both knees and that he had been receiving shots in them from the orthopaedist, which helped for a few days. (R. at 492-93.) His blood pressure reading was 144/95 in the right arm and 149/101 in the left. (R. at 492.) Both knees were swollen, and there was a small cystic area on the posterior right knee. (R. at 493.) Dr. Litton diagnosed knee pain, arthritis, high blood pressure and high blood cholesterol. (R. at 493.)

Horne saw Dr. Mullins on October 5, 2011, with complaints of right knee pain and right hand pain and numbness. (R. at 520-21.) X-rays of the knee showed

some mild degenerative-type changes in the patellofemoral joint. (R. at 521.) Physical examination showed significant crepitus in the patellofemoral joint with palpation and range of motion, moderate effusion, full range of motion and no gross instability. (R. at 521.) Horne declined an injection, and Dr. Mullins initiated a course of Relafen and a knee sleeve. (R. at 521.) Dr. Mullins noted that Horne had complained of progressively worsening right hand pain and numbness for years, which braces no longer helped, and which now significantly disrupted his activities, especially when driving or talking on the phone, and his ability to use a trowel at his job. (R. at 521.) Dr. Mullins also noted that Horne's job as a brick mason required a lot of gripping. (R. at 521.) Horne exhibited a positive Phalen's test[15] at approximately 45 seconds, but Tinel's sign[16] was negative, and there was no thenar atrophy. (R. at 520.) Horne opted to proceed with the carpal tunnel release, which Dr. Mullins performed on October 6, 2011, without complications. (R. at 501-02, 520.)

When Horne saw Dr. Mullins for a surgical follow-up on October 19, 2011, he was doing well and had minimal complaints. (R. at 519.) He stated that he had experienced no numbness since the surgery. (R. at 519.) Dr. Mullins released Horne to perform activities as tolerated, and he instructed him in scar massage and strengthening exercises. (R. at 519.) On November 7, 2011, Horne returned to see Dr. Mullins for another surgical follow-up. (R. at 585-86.) He reported doing well overall and stated that the numbness had resolved. (R. at 585.) Horne reported only a little soreness and some weakness with grip strength, but he noted that these

---

[15] Phalen's test is a provocative test used in the diagnosis of carpal tunnel syndrome. *See* www.physio-pedia.com/Phalen's_Test (last visited Nov. 17, 2014).

[16] Tinel's sign is a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve caused either by a partial lesion or the beginning regeneration of a nerve. *See* Dorland's at 1526.

continued to improve. (R. at 585.) Horne continued to report difficulties with both knees, the left worse than the right. (R. at 585.) Dr. Mullins indicated that the ultimate treatment for his knees was going to be a total knee replacement, especially on the left side, but he recommended delaying that as long as possible. (R. at 585.) Physical exam showed significant effusion in the left knee and diffuse tenderness with palpation along the medial and joint lines. (R. at 585.) Horne reported great difficulty performing his job as a brick mason, which Dr. Mullins found understandable, as it required a lot of squatting, "up and down type activities," and given the severity of Horne's problems, he thought that it was reasonable for Horne to consider leaving that job. (R. at 585-86.)

When Horne returned to Dr. Litton on November 22, 2011, physical examination showed a restricted range of motion of both knees without swelling or edema, there was no tenderness to palpation, no warmth, normal deep tendon reflexes and normal coordination, normal strength and tone, normal sensation, no instability, subluxation or laxity and no known fractures or deformities. (R. at 533-34.) No meniscal integrity tests were performed, but there was no tenderness on ambulation of the knees. (R. at 534.) There was pain with flexion and extension in the knees, and crepitus was present. (R. at 534.) Dr. Litton diagnosed high blood pressure and arthritis. (R. at 534.)

Dr. Mullins completed a Medical Opinion Re: Ability To Do Work-Related Activities (Physical) on November 27, 2011, finding that Horne could lift and carry items weighing up to 50 pounds occasionally and up to 25 pounds frequently. (R. at 588-91.) He found that Horne could stand and walk for a total of about four hours in an eight-hour workday and sit for a total of about four hours in an eight-hour workday. (R. at 588.) Dr. Mullins opined that Horne could sit for one hour at

-21-

a time and stand for 45 minutes at a time. (R. at 588-89.) He also opined that Horne must walk around for five minutes every hour. (R. at 589.) Dr. Mullins found that Horne must shift at will from sitting or standing/walking. (R. at 589.) Dr. Mullins explained that Horne had significant bilateral knee osteoarthritis, unresponsive to conservative treatment. (R. at 589.) He further found that Horne could not squat, crawl, kneel, climb or work around heights. (R. at 589.) Dr. Mullins opined that Horne could occasionally twist, bend (stoop), crouch, and climb stairs, but never climb ladders. (R. at 589-90.) He found that Horne's ability to push/pull was affected by his knee arthritis, which was supported by x-rays and arthroscopy. (R. at 590.) Dr. Mullins opined that Horne should avoid even moderate exposure to hazards, such as machinery and heights. (R. at 590.) He concluded that Horne would be absent from work about three times monthly due to his impairments or treatment. (R. at 591.)

Horne returned to Dr. Mullins on December 12, 2011, for complaints of bilateral knee pain, which disrupted his activities, rest and sleep. (R. at 608, 610.) Dr. Mullins noted that he had discussed extensively potential viscosupplementation,[17] but Horne was fairly adamant that he did not want to pursue that due to a significant fear of needles. (R. at 610.) Dr. Mullins reported that there was "[n]ot a great deal else to offer." (R. at 610.) He stated that "[t]he ultimate treatment is going to be a total knee replacement," but further stated that Horne did not wish to pursue that. (R. at 610.) Dr. Mullins initiated Relafen and Voltaren gel. (R. at 608, 610.)

---

[17] Viscosupplementation is a treatment used for arthritis of the knee in which a gel-like fluid is injected into the knee joint, which acts like a lubricant to enable the bones to move smoothly over each other and a shock absorber for joint loads. *See* www.orthoinfo.aaos.org/topic.cfm?topic=A00217 (last visited Nov. 17, 2014).

Dr. Litton completed a Medical Opinion Re: Ability To Do Work-Related Activities (Physical) on December 29, 2011, finding that Horne could lift and carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently. (R. at 593-96.) She further found that Horne could stand and walk for a total of less than two hours in an eight-hour workday and sit for a total of about six hours in an eight-hour workday. (R. at 593.) Dr. Litton opined that Horne could sit for 45 minutes before needing to change position and stand for 15 minutes without having to change position. (R. at 593-94.) Dr. Litton further opined that Horne must walk around for 10 minutes every 20 minutes. (R. at 594.) She found that Horne required the ability to shift at will from sitting or standing/walking, and he would sometimes need to lie down at unpredictable intervals during a work shift. (R. at 594.) Dr. Litton opined that this would occur on a weekly basis. (R. at 594.) She stated that these findings were based on Horne's carpal tunnel syndrome, his arthritic knees with effusion in the left knee and diffuse pain. (R. at 594.) Dr. Litton further noted that the orthopaedist had stated in a letter to her that Horne could not work. (R. at 594.) Dr. Litton opined that Horne could occasionally twist, stoop (bend) and climb stairs and ladders, but never crouch. (R. at 594-95.) She found that his abilities to handle, to finger, to feel and to push/pull were affected by his impairments, in that he had decreased sensation, numbness in the fingers and pain with wrist motion due to carpal tunnel syndrome. (R. at 595.) Dr. Litton opined that Horne was limited in his ability to kneel, to crawl and to move his legs. (R. at 595.) Dr. Litton concluded that Horne's impairments or treatment would cause him to absent from work more than three days monthly. (R. at 596.)

On January 9, 2012, Horne complained to Dr. Mullins of severe bilateral knee pain which disrupted his activities, rest and sleep. (R. at 608.) Dr. Mullins noted that "[s]tairs are fairly excruciating for [Horne]." (R. at 608.) He stated that

Horne had reached the point where he stayed home most of the time due to discomfort and pain. (R. at 608.) Dr. Mullins reiterated his belief that Horne's filing for disability was not unreasonable given his job as a brick mason. (R. at 608.) Dr. Mullins opined that Horne would be a candidate for retraining to a more sedentary-type position, but he was unsure of his education and experience. (R. at 608.) He again stated that total knee replacement would be an option, but he would recommend trying viscosupplementation first, which Horne agreed to consider. (R. at 608.) Dr. Mullins refilled Horne's Lortab. (R. at 608.) On April 11, 2012, Horne reported that his right knee pain was greater than the left. (R. at 607.) X-rays showed mild to moderate tricompartmental degenerative joint disease on the left and mild to moderate degenerative joint disease on the right, especially in the patellofemoral joint. (R. at 607.) Dr. Mullins noted that he was going to try a course of viscosupplementation, and he administered the first Euflexxa injection in the right knee. (R. at 607.) Horne returned the following week and received a second Euflexxa injection in the right knee. (R. at 606.) He returned on April 25, 2012, stating that he was doing no better and that injections did not seem to be helping. (R. at 606.) Dr. Mullins administered a third Euflexxa injection and scheduled him to return in six weeks. (R. at 606.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2013). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant

work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2013).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423, 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated February 13, 2012, the ALJ denied Horne's claims. (R. at 21-29.) The ALJ found that the medical evidence established that Horne had severe impairments, namely degenerative joint disease of the knees; spondylosis of the lumbar spine; atherosclerotic stenosis of both carotid arteries; and carpal tunnel syndrome, status-post right carpal tunnel release, but the ALJ found that Horne did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23-24.) The ALJ found that Horne had the residual functional capacity to perform a range of sedentary work. (R. at 24.) The ALJ found that Horne was unable to perform any of his past relevant work. (R. at 28.) Based on Horne's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the

-25-

national economy that Horne could perform, including jobs as production worker, a laborer and a hand bander. (R. at 28-29.) Thus, the ALJ concluded that Horne was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 29.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

In his brief, Horne argues that the ALJ erred by failing to ask the vocational expert whether her testimony conflicted with the Dictionary of Occupational Titles, ("DOT"), and, if so, whether there was a reasonable explanation for this conflict. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) Horne also argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Brief at 7-8.) Specifically, Horne argues that the ALJ erred by failing to give appropriate weight to the opinions of Drs. Litton and Mullins, his treating physicians. (Plaintiff's Brief at 7-8.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein.

*See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975.)  Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

I first find that the plaintiff's argument that the ALJ erred by failing to ask the vocational expert whether her testimony conflicted with the DOT and, if so, whether there was a reasonable explanation for the conflict, is baseless for the following reasons.  Pursuant to Social Security Ruling 00-4p, vocational expert testimony can provide more specific information about jobs than the DOT, may include information not listed in the DOT and may be based upon a vocational expert's experience in job placement or career counseling.  *See* S.S.R. 00-4p, WEST'S SOCIAL SECURITY REPORTING Service, (West Supp. 2013).  In an unpublished opinion, the Fourth Circuit held that S.S.R. 00-4p clarifies 20 C.F.R. §§ 404.1566, 416.966, which state, "without more, that ALJs will consider both the [DOT] and vocational expert testimony to determine whether a … claimant can find work suited to his residual functional capacity."  *Fisher v. Barnhart*, 181 F. App'x 359, 365 (4th Cir. May 16, 2006).  The ALJ must first "inquire, on the record, as to whether or not there is such consistency."  S.S.R. 00-4p.  When there is a conflict between the DOT and a vocational expert's testimony, the ALJ must elicit a reasonable explanation for the conflict before relying on the vocational expert's testimony to support a determination or decision about disability.  *See* S.S.R. 00-4p.  The *Fisher* Court held that the vocational expert's testimony can be used if the ALJ finds that it is based on the expert's own "experience in job

placement or career counseling." 181 F. App'x at 365 (quoting S.S.R. 00-4p). In *Fisher*, the court found that the ALJ elicited a reasonable explanation for the vocational expert's knowledge of the various jobs' sit/stand option, which is not provided by the DOT, when the vocational expert stated that he believed the jobs listed would accommodate a sit/stand option "based on his experience." 181 F. App'x at 366.

As stated previously, here, at the beginning of the vocational expert's testimony, the ALJ inquired: "Do you understand that if you give an opinion that conflicts with the information in the DOT that you need to advise us of the conflict and the basis for your opinion?" (R. at 50.) The vocational expert responded: "Yes." (R. at 50.) At the conclusion of the vocational expert's testimony, the ALJ asked the vocational expert: "Ms. Cash, has your testimony been consistent with the [DOT] except with regard to the sit-stand option?" (R. at 56.) The vocational expert stated: "Yes, sir." (R. at 56.) The ALJ asked: "And how did you arrive at your opinions with regard to the sit-stand option?" (R. at 56.) The vocational expert answered: "Because I'm a vocational expert, and I am familiar with those jobs, and I do job placement, so I know that's available." (R. at 56.)

Based on these exchanges between the ALJ and the vocational expert, I find it clear that the ALJ did, undoubtedly, ask the vocational expert whether her testimony conflicted with the DOT. Additionally, as the *Fisher* Court found, I now find that the ALJ elicited a reasonable explanation from the vocational expert for the conflict. More specifically, the vocational expert stated that she based her opinion on her familiarity with the jobs enumerated and her experience as a vocational expert who performs job placement. Moreover, in his decision, the ALJ stated that "to the extent limitations provided in the … residual functional capacity

-28-

assessment are not addressed by the [DOT], [the vocational expert] relied on her education and experience in the field of vocational rehabilitation." (R. at 29.) Thus, the ALJ also provided in his decision an explanation of how he resolved the conflict. All of this being the case, I find that the ALJ did not err in this manner.

Next, Horne argues that the ALJ erred by improperly determining his residual functional capacity. Again, I am not persuaded by this argument. Horne argues that the ALJ should have given more weight to the opinions of Dr. Litton, his treating physician, and Dr. Mullins, his treating orthopaedist. The ALJ found that Horne could perform only a limited range of sedentary work. However, on December 29, 2011, Dr. Litton opined that Horne could not successfully complete an eight-hour workday on a regular and continuing basis, and she found that he would be absent from work more than three times monthly due to his impairments or treatment. The ALJ found Dr. Litton's opinion somewhat consistent with the objective medical evidence, but noted that it appeared to overstate many of Horne's functional limitations, which were not supported by the evidence of record. (R. at 27.) The ALJ further found that Dr. Litton's opinion was conclusory and provided little explanation of the evidence upon which she relied in forming it. (R. at 27.) For these reasons, the ALJ gave moderate weight to Dr. Litton's opinion. (R. at 27.) Dr. Mullins's November 27, 2011, opinion, which is set out in its entirety herein, also was given moderate weight by the ALJ. (R. at 27.) The ALJ stated that, like Dr. Litton's opinion, Dr. Mullins's opinion was somewhat consistent with the objective medical evidence, but, giving Horne's allegations the benefit of the doubt, the ALJ found that Horne was more likely limited to a range of sedentary work. (R. at 27.) Thus, the ALJ actually found Horne to be more limited than as found by Dr. Mullins. The ALJ also noted that Dr. Mullins's opinion that Horne would miss about three days monthly due to his impairments or

treatment was out of proportion to the other limitations that Dr. Mullins found. (R. at 27.) The ALJ further stated in his decision that he was giving moderate weight to the opinions of the state agency physicians, who found that Horne should be limited to a range of light work with some additional postural and environmental limitations. (R. at 27.) The ALJ stated that he found these opinions generally consistent with the record as a whole, but he gave Horne's allegations the benefit of the doubt in finding him more limited than suggested by the state agency physicians. (R. at 27-28.)

The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof in disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(c), 416.927(c). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Based on my review of the record, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and ultimate residual functional capacity and disability finding. After undergoing left knee surgery in May 2011, Horne continued to complain of left knee pain. However, radiographic testing revealed only mild findings. For instance, October 5, 2011, x-rays of the

left knee showed only mild degenerative-type changes in the patellafemoral joint. Also, an April 11, 2012, x-ray of the left knee showed mild to moderate tricompartmental degenerative joint disease. X-rays of the right knee from April 2012 showed mild to moderate degenerative joint disease of the patellafemoral joint. Physical examinations of Horne's knees also generally were normal, except for some restricted range of motion secondary to pain, some crepitus and swelling and some tenderness to palpation. Otherwise, Horne generally had normal deep tendon reflexes, coordination, strength, tone and sensation, no instability, subluxation or laxity and no known fractures or deformities. He was released to perform activities as tolerated in June 2011. In September 2011, Horne reported recovering well from the knee surgery. On November 22, 2011, the last date that Dr. Litton treated Horne before rendering her December 29, 2011, opinion, physical examination was positive only for a restricted range of motion of both knees. There was no swelling or edema, no tenderness to palpation and no warmth, and deep tendon reflexes, coordination, strength, tone and sensation were normal, with no instability, subluxation or laxity and no known fractures or deformities.

Furthermore, despite Horne's complaints of disabling knee pain, he did not follow through with his treating orthopaedist's orders to complete a course of physical therapy following knee surgery. In fact, there is no evidence that he ever began the physical therapy. He also declined, initially, a recommended viscosupplementation treatment for his knee, as well as knee injections. Finally, Horne's activities of daily living do not support a finding of disability. For instance, Horne stated in an August 2010 Function Report that he cared for the family pets with his daughter's help and that he performed household repairs and mowed the yard with help. (R. at 215-16.) Horne stated that he could drive a car and could go out alone. (R. at 217.) He listed hunting and fishing as hobbies and

stated that he did not do these "too often" anymore. (R. at 218.) In a February 2, 2011, Function Report, Horne again stated that he cared for the family pets with help, and he performed yard work at times. (R. at 231-32.) He continued to report that he drove a car. (R. at 233.)

It is important to note that, despite Horne's allegations of disabling pain, he attempted to return to work as a mason. A letter from his employer dated February 7, 2013, indicates that Horne's last day of work was not until January 28, 2013, at which time he attempted to lay block twice, but he became dizzy, resulting in his going home after only two hours.[18] (R. at 273.) Also, although Dr. Litton stated that Horne *ultimately* would require a total knee replacement, for the reasons already stated, the medical evidence does not support that this was the case at the time period relevant to the disability decision.

As for Horne's right hand impairment, the medical evidence shows that his numbness resolved following carpal tunnel release surgery in October 2011. Dr. Mullins released Horne to perform activities as tolerated later that month. By November 2011, Horne reported that his numbness had resolved and that his weakness and grip strength continued to improve. With regard to Horne's carotid artery disease and hypertension, the medical evidence shows no evidence of neurological symptoms. Despite evidence of prior multiple lacunar infarcts, Dr. Holt, a neurologist, opined that this was due to uncontrolled hypertension and medication noncompliance. He treated Horne conservatively with aspirin and statin therapy. Lastly, although the ALJ deemed Horne's lumbar impairment severe, the radiographic evidence from May 2010 yielded only mild spondylosis at multiple

---

[18] The court notes its understanding that Horne had not performed substantial gainful activity since June 11, 2010. However, the court also notes Horne's continued attempts to work, despite his allegations of disabling impairments.

Case 1:13-cv-00049-PMS   Document 17   Filed 11/18/14   Page 32 of 33   Pageid#: 698

levels. Likewise, physical examinations were relatively benign, showing only decreased lumbosacral range of motion in May 2010, decreased lumbosacral flexion in August 2010 and tender lateral lumbar muscles in March 2011. However, as stated previously, Horne's physical examinations generally were normal, demonstrating, among other things, full strength throughout, normal muscle tone, an intact gait and an ability to walk on the heels and toes and tandem walk.

Based on all of this evidence, I find that substantial evidence supports the ALJ's weighing of the evidence. That being so, I further find that substantial evidence supports the ALJ's finding as to Horne's residual functional capacity finding and his finding that he was not disabled. An appropriate order and judgment will be entered.

ENTERED: November 18, 2014.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE